[Cite as *State v. Persohn*, 2012-Ohio-6091.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO.   11 CO 37 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | O P I N I O N |
| | ) | |
| BENJAMIN PERSOHN, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:     Criminal Appeal from Common Pleas
                             Court, Case No. 11CR45.

JUDGMENT:                    Affirmed.

APPEARANCES:
For Plaintiff-Appellee:       Attorney Robert Herron
                             Prosecuting Attorney
                             Attorney John Gamble
                             Assistant Prosecuting Attorney
                             105 South Market Street
                             Lisbon, Ohio  44432

For Defendant-Appellant:      Attorney Douglas King
                             91 West Taggart Street
                             P.O. Box 85
                             East Palestine, Ohio  44413

JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Mary DeGenaro

                             Dated:  December 21, 2012

VUKOVICH, J.

{¶1} Defendant-appellant Benjamin Persohn appeals from the jury verdict rendered in the Columbiana County Common Pleas Court finding him guilty of trafficking heroin, in violation of R.C. 2925.03(A)(1). Eight arguments are raised in this appeal. The first is whether the trial court improperly limited the examination of prospective jurors. The second is whether there was evidence establishing that Persohn was the perpetrator of the alleged crime. The third is whether prior bad acts evidence was admitted at trial and whether such admission resulted in plain error. The fourth issue is whether there was an induction of inflammatory evidence that resulted in an unfair trial. The fifth is whether the verdict was against the manifest weight of the evidence. The sixth is whether there was prosecutorial misconduct that affected Persohn's substantial rights. The seventh is whether defense counsel's performance constituted ineffective assistance of counsel. Lastly, Persohn argues that even if we find all the other errors harmless, we should still reverse his conviction based on the fact that the cumulative effect of the errors deprived him of a fair trial.

{¶2} For the reasons expressed in depth below, there is no merit with any of Persohn's assignments of error. Thus, the judgment of the trial court is affirmed.

## Statement of the Case

{¶3} In April 2008, Persohn purportedly sold heroin to a confidential informant, Brian McClelland, at Persohn's residence located at 633 Riley Avenue, East Liverpool, Columbiana County, Ohio. As a result in February 2011, Persohn was indicted for trafficking heroin, in violation of R.C. 2925.03(A)(1), a fourth-degree felony. Following a trial, the jury found him guilty. Sentencing occurred one month later and Persohn received a one year sentence for the conviction. He timely appeals from that conviction and sentence.

## First Assignment of Error

{¶4} "The trial court clearly abused its discretion by placing unreasonable restrictions on defendant/appellant's counsel's voir dire of venirepersons."

{¶5} A trial court has discretion over the scope, length, and manner of voir dire and may reasonably limit an attorney's voir dire. *State v. Irwin*, 184 Ohio St.3d 764, 2009-Ohio-5271, 922 N.E.2d 981, ¶ 35 citing *State v. Abuzahrieh,* 8th Dist. No.

82689, 2003-Ohio-6639, 2003 WL 22922995, at ¶ 12, citing *State v. Williams,* 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, at ¶ 46. When examining whether the trial court abused its discretion in limiting voir dire, we look at whether the limitation was reasonable. *State v. Lundgren*, 73 Ohio St.3d 474, 481, 653 N.E.2d 304 (1995).

{¶6} Persohn claims that the trial court unreasonably limited his counsel's inquiry of the presumption of innocence. His claim is not entirely accurate of what occurred during voir dire. Defense counsel began its questioning by asking what the prospective jurors' thought the public's perception was on whether a defendant was innocent until proven guilty. The specific question was, "How many people, Americans, do you think actually believe that any Defendant is innocent until proven guilty?" Tr. 60.

{¶7} The prospective jurors answered the question and a further discussion continued about the public's perception. The state then objected to that line of questioning. Tr. 62. The trial court sustained the objection and explained, "I think the Jurors have indicated that, you know, we're talking about generalizations. You haven't asked them directly whether they can keep an open mind in this case." Tr. 63.

{¶8} Defense counsel then began asking about confidential informants, specifically whether the jurors knew what a confidential informant was. Tr. 63-64. A prospective juror provided a definition and the discussion continued. Defense counsel then started to ask the prospective jurors what they believed was the public's general perception of confidential informants. Tr. 66. The state once again objected and the trial court sustained the objection. Tr. 66. The trial court then instructed defense counsel to direct his questions to what the jurors believe, not what other people believe: "Mr. Hura, try to phrase your question where you're asking the individual juror what he or she believes rather than asking them to agree with the generality of what other people may perceive or believe." Tr. 66.

{¶9} As can be seen, the trial court did limit the questioning. However, the limitation was reasonable. The concern in voir dire is determining what the individual prospective juror believes, not the general perceptions of the public. The purpose of

questioning prospective jurors is to determine whether they can render a fair and impartial verdict. *Lakewood v. Town*, 106 Ohio App.3d 521, 525, 666 N.E.2d 599 (8th Dist.1995), citing See *State v. Duerr* (1982), 8 Ohio App.3d 404, 457 N.E.2d 843 (1st Dist.1982). It is not to determine whether the prospective jurors believe the public, in general, could render a fair and impartial verdict. Thus, the discussion of the public's general perception is irrelevant and unnecessary, unless it effects the perception of the individual juror..

{¶10} Consequently, for those reasons, we hold that the trial court did not abuse its discretion in limiting the questioning in the manner it did. This assignment of error lacks merit.

<u>Second Assignment of Error</u>

{¶11} "The trial court erred by failing to grant the defendant/appellant's motion for judgment of acquittal pursuant to Ohio Criminal Rule 29 made at the close of the state's case in chief."

{¶12} Crim.R. 29(A) provides that, "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses."

{¶13} An appellate court reviews a denial of a motion to acquit under Crim.R. 29 using the same standard it uses to review a sufficiency of the evidence claim. *State v. Rhodes,* 7th Dist. No. 99-BA-62, 2002-Ohio-1572, at ¶ 9; *State v. Carter*, 72 Ohio St.3d 545, 553, 651 N.E.2d 965 (1995).

{¶14} Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict. *State v. Smith* (1997), 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In essence, sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1977). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a

light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Smith* at 113.

**{¶15}** As previously mentioned, Persohn was convicted of trafficking heroin in violation of R.C. 2925.03(A), which states no person shall sell a controlled substance. Persohn argues that there was no evidence presented that identified him as the perpetrator of the crime.

**{¶16}** In order to warrant a conviction, the evidence must establish beyond a reasonable doubt the identity of the accused as the person who actually committed the crime. *State v. Scott*, 3 Ohio App.2d 239, 244, 210 N.E.2d 289 (7th Dist.1965). Therefore, if there was no evidence that Persohn was the perpetrator of the crime, his conviction would have to be reversed.

**{¶17}** The transcript indicates that Persohn was identified as the perpetrator of the crime. McClelland, the confidential informant, identified Persohn and testified at trial that he bought heroin from Persohn at Persohn's home:

> Q. Okay. Well, did you just provide him, Detective Weekley, with some information or did you make some proposal to Detective Weekley?
>
> A. Made a proposal.
>
> Q. Which was that –
>
> A. Make a buy.
>
> Q. Who was going to make a buy?
>
> A. Me.
>
> Q. From whom?
>
> A. Ben Persohn.
>
> * * *

Q.  Brian, at this point in time I'm going to ask you to please turn and point to him and describe to me what he's wearing?

A.  He's wearing a tie, shirt, blue shirt.

Mr. Gamble [Prosecutor]:  Your Honor, would the record reflect he's identified the Defendant, Ben Persohn?

The Court:  It will.

* * *

Q.  And you walked where?

A.  Ben's house.

Q.  And is that 633 Riley Avenue?

A.  Yes.

Q.  When you went in to Ben's house, tell me what happened?

A.  Made the buy.

Q.  Okay.  Tell me how it happened?

A.  What do you mean?

Q.  Well, you know, we weren't there.  When you walked in, tell me what you did and what the Defendant did?

A.  Just walked in, asked me [sic] how much it was.  He told me. I gave him the money.  He gave me heroin and I left.

* * *

Q.  Is there any doubt in your mind that you purchased ten unit doses of heroin from Benjamin Persohn?

A. No.

Tr. 265-266, 273-274, 284.

**{¶18}** In addition to this testimony, McClelland's statement, which was taken after the drug transaction occurred, was also admitted into evidence at trial. That statement indicates that McClelland purchased drugs from "Ben" at 633 Riley Avenue. Defendant's Exhibit 2.

**{¶19}** McClelland's identification of Persohn as the perpetrator of the crime during trial was sufficient evidence to establish identity. The officers were not also required to identify Persohn as the perpetrator of the crime. Consequently, this assignment of error lacks merit.

<u>Third Assignment of Error</u>

**{¶20}** "The trial court committed plain error warranting a reversal of the defendant/appellant's conviction herein by permitting evidence of other crimes or acts which were not admissible under Rule 404(B) of the Ohio Rules of Evidence and Ohio Revised Code Section 2945.59."

**{¶21}** Persohn argues that the prosecutor asked questions that elicited answers of other bad acts that Persohn allegedly committed. Defense counsel did not object to the questions or answers. Thus, Persohn admits that he waives all but plain error.

**{¶22}** "Under plain error analysis, it must be clear from the record that an error was committed and, except for the error, the result of the trial clearly would have been otherwise." *State v. Bock*, 16 Ohio App.3d 146, 150, 474 N.E.2d 1228 (12th Dist.1984). The plain error rule should be applied with the utmost caution and invoked only under exceptional circumstances to prevent a manifest miscarriage of justice. *State v. Cooperrider*, 4 Ohio St.2d 226, 227, 212 N.E.2d 796 (1983).

**{¶23}** "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show he acted in conformity therewith." Evid.R. 404(B). However, that evidence may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). The list of acceptable reasons for admitting testimony of prior bad

acts into evidence is non-exhaustive. *State v. Melton,* 11th Dist. No.2009–L–078, 2010–Ohio–1278, at ¶ 78. As the basic wording of the rule suggests, the key issue in determining admissibility is whether the evidence is merely meant to show that the defendant had acted consistent with his prior behavior, or whether its submission is meant to prove a fact that is consequential to the case. *Id.*

**{¶24}** Prior to discussing each individual allegation of alleged bad acts testimony, it is noted that the majority of the statements Persohn directs us to look at are taken out of context. The questions and answers when read in context discuss the process of having a confidential informant and executing a controlled buy. Part of Persohn's defense was that an undercover cop should have been used. Thus, any discussion as to why a confidential informant was used was done partly in response to the defense. Furthermore, when discussing the use of a confidential informant and how to perform a controlled buy, Persohn is not specifically discussed. Rather the information is general information to help the jury understand what process was used in this case to purchase drugs from Persohn.

**{¶25}** The first allegation of improper testimony concerns Detective Downard's testimony that the confidential informant needs familiarity with the person selling drugs in order to be able to buy drugs. Persohn contends that the question conveyed to the jury that McClelland, the confidential informant, had a level of comfort with Persohn because Persohn had provided him with drugs in the past.

**{¶26}** At trial, Detective Downard's testimony did contain reference to the fact that, in general, a confidential informant needs to have some type of relationship with the seller in order for a drug transaction to occur. Tr. 135-136. If there is no relationship or connection, i.e. knowledge of each other, the seller will not sell to the buyer. Tr. 135-136. Thus, that is why in most instances an undercover police officer, who does not have a prior relationship with the seller, cannot be used for a controlled buy. Tr. 135-136.

**{¶27}** This type of testimony is not other acts testimony. The testimony did not convey to the jury that McClelland had prior dealings with Persohn and thus, Persohn had a long history in selling drugs. In fact, Persohn and his alleged bad acts are not even discussed during this testimony. Detective Downard's testimony about

a confidential informant's established relationship with the seller is merely an explanation of why a confidential informant is used and why there has to be a relationship between the buyer and the seller in drug transactions. Furthermore, the testimony only indicates that there must be a prior relationship of knowing each other, not that the relationship must be based on previous sales. Tr. 135-136.

{¶28} The next alleged other acts evidence is Detective Downard's testimony that controlled buys usually start with intelligence that an individual is selling drugs. Persohn contends that the testimony suggests to the jury that Persohn had sold drugs at times other than the allegation made in this case.

{¶29} The testimony he directs this court to is found in the following discussion:

Q.    You mentioned a controlled buy.  And that is the most common method of conducting a drug investigation; is that right?

A.  Yes, it is.

Q.  Explain to the ladies and gentlemen how do you set up a controlled buy of drugs?

A.    A controlled buy will usually start with us getting the intelligence from an informant or from an undercover officer that this individual, certain individual is selling and that they can go make a buy from the individual.

What we will then do is do research on this individual, locate where they're staying, what type of vehicle they're traveling in, that type of information.  And then we will arrange the controlled buy.  Which usually involves a phone call or multiple phone calls in advance from our informant to the drug dealer to set up the deal.  [sic] Are you going to be home, do you have what I need, those types of conversations.

Once that's established, the agents that work at the task force and myself would meet with this informant at an undivulged location, a

secret location somewhere usually fairly close to where this individual lives.

Tr. 136-137.

{¶30} The testimony continues for another three pages, in which Detective Downard further explains the controlled buy process. Tr. 137-140.

{¶31} Like above, this testimony provides the jury with an explanation as to the workings of a controlled buy. Specifically, how the officers get their information that a person is selling drugs, an explanation of how a controlled buy is set up and an explanation of what occurs before, during and after a controlled buy. Furthermore, similar to the above analysis, there is no discussion that Persohn previously sold drugs. Rather this is just general information for the jury to understand the facts of this case and that this is a typical occurrence.

{¶32} The next two allegations of other acts evidence are also found in Detective Downard's testimony. He testified that it is not always possible to make a second or third buy from a particular drug dealer because of rumors that a buyer was a confidential informant or the dealer moves. Tr. 140-143. He also testified that the more drugs a person buys the cheaper the unit price and gave examples of this. Tr. 140-143. Persohn argues that the inability to make a second or third buy testimony suggested to the jury that even though only one purchase was made from Persohn, he most likely would continue to sell drugs. As to the price of the drugs being cheaper if more is bought, Persohn argues that this testimony suggests that he was involved in illegal activity beyond what the evidence in the case would establish.

{¶33} Similar to the other testimony from Detective Downard that Persohn directed us to, this testimony is not specific as to Persohn, but rather is general testimony concerning drug buys. Furthermore, as aforementioned, it is only being used to explain to the jury the process of a controlled buy.

{¶34} The next alleged other acts evidence is from the testimony of Brian McClelland, the confidential informant. In his testimony he indicated that he previously bought drugs from Persohn. The state, according to Persohn, highlighted this fact later during the examination of McClelland restating this testimony without

asking a question. The state also referred to the prior purchases in the closing argument.

**{¶35}** McClelland's testimony concerning his prior purchases from Persohn was elicited through a discussion as to McClelland contacting Detective Weekley of the Columbiana County Drug Task Force to tell Detective Weekley he could buy heroin and how he knew where to make a buy. The testimony is as follows:

Q. Okay when you contacted Detective Weekley and told him that you thought you could buy drugs – and did you mention heroin specifically?

A. What?

Q. Did you mention heroin specifically to Detective Weekley?

A. Yeah.

Q. When you called him and told him that, how did you know that you could drive to Benjamin Persohn's house and buy heroin?

A. I got it off him before.

Q. You purchased heroin from Ben Persohn before?

A. Yeah.

Q. At his house on 633 Riley Avenue in East Liverpool?

A. Yeah.

Q. Can you estimate for me, approximately how many times you might have purchased heroin from Persohn prior to that date that you did the controlled buy?

A. Just a couple. Not many.

Tr. 268-269.

**{¶36}** This testimony does establish that McClelland previously bought drugs from Persohn. However, it is not being used to show that Persohn acted in conformity with that prior act. Rather, the testimony is used to show why McClelland stated to Detective Weekley he could purchase the drugs.

**{¶37}** Next, the testimony concerning the state's alleged restatement of prior purchases occurred during the following dialog:

Q. All right. You can return to the witness stand. You indicated earlier that you had previously purchased heroin from Persohn three times or so, maybe more. How did you become acquainted with him?

A. I knew his sister.

Tr. 284.

**{¶38}** The testimony continues with a discussion of how McClelland knew Persohn's sister.

**{¶39}** Persohn incorrectly states that the prosecution did not ask a question. The statement made was an introduction to the question being asked about how McClelland became acquainted with Persohn. The state did not merely restate the testimony to highlight prior bad acts, but rather to determine how McClelland first met Persohn. This conforms to the earlier testimony that there must be a prior relationship with seller and buyer before the seller will sell to the buyer.

**{¶40}** Lastly, the closing argument does refer to the prior purchases. That argument provides:

And then later, after Brian McClelland had been Indicted and pleaded guilty to the offense of possession of drugs, and was granted Intervention in Lieu of his conviction, he was on a treatment plan, if you will, he found himself in trouble again. You heard him say that he tested positive for marijuana. He had not been using heroin. But he had tested positive for marijuana and found himself in the [sic] trouble with the Court again because he violated the terms of his Community Control, or his Intervention.

And to provide himself some additional incentive there, or cooperation, potential cooperation, he called Detective Weekley. And he called him on April 2nd [sic], 2008. He said, I can buy some heroin from the Defendant, Ben Persohn.

And how did he know that? Now, none of us could, this week, knock on Ben Persohn's door and buy dope from him. None of us could. Because dope dealers like Ben Persohn would not sell to someone like you and me. Not that there's anything particularly unusual about us, except for the fact that he doesn't know us.

So why would he sell dope to Brian McClelland? Because Brian McClelland had already bought dope from him. That's how I know I can buy dope says Brian McClelland. Because I bought dope off Ben Persohn two or three times before this.

Tr. 374-375.

**{¶41}** This argument by the prosecutor was merely rehashing the testimony and providing an explanation as to why McClelland could be a confidential informant.

**{¶42}** In all, Detective Downard's testimony, McClelland's testimony and the prosecutor's questions, statements and arguments are not being used as evidence to show that since there were prior dealings, this dealing occurred. Instead the testimony was elicited so the jury could have an understanding as to how a controlled buy occurs and why McClelland could be used as a confidential informant in this instance, i.e. a prior relationship with Persohn. The arguments made by the prosecutor during closing arguments were merely a rehash of the explanation with application to the facts at hand. Thus, none of the complained of testimony is inadmissible other acts evidence; there was no error here, let alone plain error. This assignment of error lacks merit.

Fourth Assignment of Error

**{¶43}** "In the absence of overwhelming evidence of defendant/appellant's guilt, his conviction was based upon improper and/or inflammatory evidence such that he was denied his right to due process and a fair trial."

**{¶44}** Persohn contends that during trial the jury was bombarded with irrelevant, improper and inadmissible evidence and comments that were offered for the sole purpose of inflaming the passions of the jury. He contends that this violated his due process rights and his right to a fair trial. Thus, he asserts that the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated.

**{¶45}** As with the third assignment of error, he directs this court to numerous portions of the transcript. He did not object to any of the comments or testimony he is directing this court to review. Thus, a plain error analysis also applies to this assignment of error.

**{¶46}** His first four allegations deal with reference to societal drug problems, including heroin use in Columbiana County, reference to the common usage of controlled buys by police departments throughout the country, and reference to the commonality of the prosecution of sellers that are busted through a controlled buy.

**{¶47}** Similar to the third assignment of error, Persohn is directing this court to portions of statements made by either Detective Downard or the prosecutor and suggesting that they imply something that they do not.

**{¶48}** For instance, the prosecutor does indicate that heroin is a very common problem in Columbiana County. Tr. 117. However, that statement was made during the opening statement to explain how McClelland became a confidential informant for the Columbiana Drug Task Force. The prosecutor was explaining that McClelland was addicted to heroin and got himself into trouble; he pled guilty to possession of heroin. Tr. 117. He went through an intervention program where he got help and was put on community control. He violated his community control by testing positive for marijuana. Tr. 118. He contacted the task force to work as a confidential informant so that he could potentially lessen any penalty he would receive for violating community control. Thus, the statement was a passing remark. It was not

being used to indicate that Persohn should be convicted because heroin is a common community problem.

**{¶49}** Similarly, Detective Downard's alleged reference to a large societal drug problem is also a misstatement of his testimony. In the testimony that Persohn directs this court to, Detective Downard does not use the words "large societal drug problem." He does not even indicate that there is a large societal drug problem. Rather, he was asked how the task force finds people who are willing to be confidential informants. Tr. 134. He said there are different ways. One way is people who have or are involved in the lifestyle and want to earn money as a confidential informant. Tr. 134. Another way is people who see it going on in their community and just want to do it to get the illegal substance off the streets. Tr. 134. Lastly, he explained that some do it because they are already charged with another crime and they want a recommendation to the prosecutor on their behalf in hopes of reducing the charges or lessening the penalty. Tr. 134-135.

**{¶50}** The prosecutor did make comments in the opening statement that a controlled buy is used by every department in the country and that he has tried cases like this many times, which makes them a little rudimentary to him. However, these statements were not inflammatory. In explaining what a controlled buy is, the prosecutor said it is done in every department in the United States of America. This is not an inaccurate statement. Detective Downard even indicated in his testimony that these types of buys are commonplace. Furthermore, this statement in no way suggests that Persohn is guilty or that he should be found guilty.

**{¶51}** Next, Persohn complains about the prosecutor's comment during opening statement that the case is "a little rudimentary." The statement in its entirety is:

> That's the evidence. It's pretty simple. And it's pretty straightforward. Now, I've done this a lot of times. But it's important. This is a little rudimentary. This isn't a complicated case. It's not going to take a week to prove. But we've place this burden of proof upon ourselves because it's important.

Tr. 123.

**{¶52}** Clearly when read in its context, the prosecutor is emphasizing that although it is rudimentary, the facts are straightforward and the burden is on him, as the state, to prove that the crime occurred. Consequently, nothing in the statement is inflammatory, irrelevant or improper.

**{¶53}** The next two alleged improper comments were discussed in the third assignment of error. They are: 1) Detective Downard's testimony that the confidential informant needs to have familiarity with the seller, and 2) Detective Downard's testimony that a controlled buy starts with intelligence that an individual is selling drugs.

**{¶54}** No new arguments concerning these statements are made under this assignment of error. Thus, the previous analysis that the testimony was not improper equally applies to this assignment of error.

**{¶55}** The next alleged inflammatory and irrelevant testimony is Detective Downard's statement that drug dealers have robbed people before. Persohn contends that this was an indication that he is a dangerous individual.

**{¶56}** Detective Downard does make this statement. However, at the time he made it he was discussing what occurs during a controlled buy and how the task force ensures that the confidential informant is safe. The testimony is as follows:

> And then we will equip them [confidential informant] with some type of recording or transmitting device. That can be, at minimum it's an audio device where it will record the conversations that the informant has with the drug dealers so we can hear what's going on. It also transmits so we can actually hear real time where officers are strategically placed around where this deal is supposed to take place. So they can hear what's going on in case the deal goes bad.

> You know we have had – these are drug dealers. They have robbed people before. So we take that precaution, make sure our informant is safe. We will send our informant to the house, listen to

> what's going on, let the deal take place. The informant will then take the purchased narcotics, leave that house and return to us.

Tr. 139-140.

**{¶57}** This is not an indication that Persohn is a dangerous person. Rather it is an indication of how the officers keep the confidential informant safe. There is an illegal activity occurring and with any illegal activity there is a potential for individuals to get hurt, including the officers and the confidential informant.

**{¶58}** The next two alleged improper comments were discussed in the third assignment of error. They are: 1) Detective Downard's testimony that the Drug Task Force is not always able to make a second or third buy from a particular seller, and 2) Detective Downard's testimony that the more drugs an individual buys the lower the price is for a unit dose.

**{¶59}** No new arguments concerning these statements are presented under this assignment of error. Thus, the analysis under the third assignment of error finding that these statements were not improper equally applies here.

**{¶60}** The next alleged inflammatory, improper and/or irrelevant testimony is Detective Downard's "seventeen (17) pages [of testimony] regarding what drug dealers in Columbiana County normally do and whether or not drug dealers are dangerous people" and his testimony about the drug epidemic in Columbiana County. This alleged testimony occurred before a single question was asked regarding the specific allegations against Persohn.

**{¶61}** There are multiple pages of testimony concerning whether an undercover police officer can be used in most situations to perform buys, if a confidential informant can be used to perform a controlled buy and what occurs during a controlled buy with a confidential informant. As explained under the third assignment of error, this testimony was laying a foundation for the jury of what occurs during a controlled buy with a confidential informant and why a confidential informant needs to have a relationship with the buyer in order for the controlled buy to work. This is not irrelevant information; the jury needs it to understand the facts of the case and what occurred. Admittedly, the prosecutor could have somehow mixed this

information in with questions concerning the actual facts of this case. However, laying it out first was not inflammatory or improper.

{¶62} The next allegation is that Detective Downard improperly testified to a hearsay identification of Persohn. Detective Downard was asked whether he was able to hear the transmission of the drug deal while he was in his car doing surveillance. Tr. 151. He responded that he was. Tr. 151. He was then asked to describe the nature of the conversation. Tr. 151. He responded, "I recall from the audio that he [McClelland] had, he walked up to the residence on Riley, I believe knocked at the door, was let inside and started speaking with the gentlemen who he later said was Ben Persohn." Tr. 151. Persohn claims this statement is hearsay identification.

{¶63} Hearsay is defined in Evid.R. 801 as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 802 governs the admissibility of hearsay evidence and indicates that hearsay is inadmissible in the absence of an exception.

{¶64} Detective Downard's testimony does constitute hearsay identification; the testimony is being offered for the truth of the matter asserted, i.e. that Persohn was the seller. The audio does not identify Persohn and Detective Downard later admits that he did not see the buy happen. Thus, Detective Downard's knowledge that Persohn was the seller solely comes from McClelland. That said, there is no harm in this identification. As explained under the second assignment of error, McClelland testified and identified Persohn during that testimony as the person who sold him heroin at the Riley Avenue residence. Thus, while Detective Downard should not have stated that McClelland later said it was Ben Persohn who sold him drugs, when considering the other evidence of identification, this was harmless.

{¶65} The next allegation is Detective Downard's testimony that McClelland made arrangements to purchase drugs from Persohn in the future. Detective Downard did testify to that, however, he was testifying as to what he heard during the drug transaction. The recording of the transaction was played for the jury and is an exhibit that is available for this court to review. Detective Downard's testimony is

accurate as to what can be heard on the recording. Thus, there is nothing improper regarding the testimony.

{¶66} The next alleged improper/inflammatory testimony is Detective Downard's alleged testimony about whether or not the confidential informant was telling the truth about what occurred inside 633 Riley Avenue.

{¶67} On direct examination, Detective Downard was asked and testified about what he heard during the audio of the drug transaction. On cross-examination, defense counsel asked questions concerning whether Persohn was really the drug seller and if they had any evidence, other than the confidential informant, that identified Persohn as the seller. For instance, Detective Downard was asked whether Persohn was identified on the audio, which he was not. Tr. 169. Detective Downard was asked whether he could see 633 Riley Avenue when he was doing surveillance. He stated that he could not. Tr. 165. On redirect examination, the following colloquy occurred:

> Q. Earlier you testified that you can hear the conversation about a bun, how much do you want for the bun [a unit of heroin]. When Mr. Hura played that for you, did you hear Brian McClelland ask the person, who's described to you as Ben Persohn, how much he wanted for the bun?
>
> A. Yes, I did.
>
> Q. And did you hear right after that conversation about money, the comment ended with 50, something 50?
>
> A. Yes.
>
> Q. Okay. Does that confirm for you the information that McClelland provided you later about what had taken place inside the residence of 633 Riley Avenue?
>
> A. Yes, it does.

Tr. 172.

{¶68} Persohn implies that Detective Downard's testimony was an attempt to bolster McClelland's credibility. Generally, the opinion of a witness as to whether another witness is being truthful is inadmissible. *State v. Boston*, 46 Ohio St.3d 108, 128, 545 N.E.2d 1220 (1989) (overruled on other grounds). It is undisputed that a police officer may not testify as to a witness's veracity. *State v. Black,* 8th Dist. No. 92806, 2010–Ohio–660, at ¶ 31, citing *State v. Davis,* 116 Ohio St.3d 404, 2008–Ohio–2, 880 N.E.2d 31, ¶ 122. In our system of justice, it is the factfinder, not the expert or lay witness, who bears the burden of assessing the credibility or veracity of a witness. *State v. Eastham*, 39 Ohio St.3d 307, 312, 530 N.E.2d 409 (1988).

{¶69} This testimony is not bolstering the credibility of McClelland, but is merely a statement as to what the evidence demonstrates to him, which is that a drug transaction occurred inside the Riley Avenue residence. As aforementioned, the line of questioning was asked because the defense was highlighting the fact that there was no video and Detective Downard did not see what occurred. The defense was questioning why Detective Downard reached the conclusion that a drug transaction occurred. Detective Downard's testimony was merely stating it was based on his experience in controlled buys and what he heard on the audio.

{¶70} The next alleged improper testimony came from Detective Weekley, an officer with the Columbiana County Drug Task Force. Persohn claims it was improper for Detective Weekley to testify that Persohn sold heroin to a Rick Dalrymple and that Dalrymple died of an overdose.

{¶71} Prior to Detective Weekley's testimony Detective Downard testified. During Detective Downard's testimony he was asked whether McClelland was the first person to indicate that Persohn was selling drugs. He said he was not sure, but he thought so. During Detective Weekley's testimony he was asked how he became involved in the drug transaction that occurred between McClelland and Persohn. He explained that initially he had an informant, Leonard DeSarro, advise him of a white male named Ben transporting heroin into Wellsville to a known drug addict named Rick Dalrymple. Tr. 200. Detective Weekley asked DeSarro if he could make a buy. DeSarro said no because he had never dealt with Ben; he just knew where Dalrymple was getting the heroin. Tr. 201. Months later another informant,

McClelland, came forward and said he could buy heroin off of Ben Persohn. Tr. 201-203. Detective Weekley explained that McClelland's information matched up with what DeSarro had told him. Tr. 201. Detective Weekley was then asked if he was able to enlist Dalrymple to help in providing information about Persohn. Tr. 202. He responded no, Dalrymple would not cooperate and later he died of a drug overdose. Tr. 202.

{¶72} This information was not inflammatory. It does not insinuate that Persohn sold Dalrymple the drugs he overdosed on. Rather it shows that the information from informants concerning Persohn was similar and that is how the Drug Task Force became involved in trying to set up a controlled buy from Persohn. It also shows why the Drug Task Force was investigating Persohn and why there was only one informant.

{¶73} The next two allegations were previously discussed in the third assignment of error. They are: 1) McClelland's testimony that he purchased drugs from Persohn, and 2) that McClelland knew Persohn from Persohn's sister. This assignment of error expands upon the argument that was previously made concerning Persohn's sister. The testimony about Persohn's sister concerned how McClelland became friends with her. Tr. 284. He explained that she worked across the river at "Fantasies or one of them places." Tr. 284. She was an entertainer there. Tr. 284.

{¶74} This testimony is not inflammatory. While it is irrelevant where she worked and what she did, this does not impact Persohn. The testimony does not concern him and does not suggest in any way that he is guilty because his sister is an entertainer at a club. Furthermore, the testimony in no way suggests that she was doing any illegal activity at the club. Thus, the testimony does not amount to plain error.

{¶75} Next, Persohn contends that the prosecutor ridiculed his attorney's theory of the case that there was insufficient evidence to prove that Persohn was the one who sold the drugs. The alleged ridicule occurred during Detective Hedrick's testimony; Detective Hedrick was one of the officers for the Drug Task Force that was doing surveillance during the controlled buy. During his cross-examination defense

counsel asked whether there was any video or photographs of the drug buy. Tr. 316-318. The officer stated there was not. The officer was then asked whether the best evidence would be video and photographs and if the task force has the equipment to do that. Tr. 319. Detective Hedrick responded that it would be the best evidence and they do have equipment to have video recordings and photographs. Tr. 319.

{¶76} Upon redirect examination, the following colloquy occurred between the prosecutor and Detective Hedrick:

> Q. And again, Detective Hedrick, where you were, and as you testified, by virtue of the location of Defendant's residence, 633 Riley Avenue, were you able to take the photographs that Mr. Hura [defense counsel] so desperately wanted you to take?
>
> A. No.

Tr. 319.

{¶77} While the last phrase of the question could have been omitted, the question does not ridicule the theory. Rather, after there had been multiple pages of questions concerning the lack of pictures and video, the prosecutor was asking if pictures and video were a possibility in this case. This question was not so improper as to deprive Persohn of a fair trial.

{¶78} The remainder of the alleged improper statements concern the prosecutor's closing argument. In 1 1/2 pages of argument, Persohn directs this court to multiple statements in the closing argument that he suggests are improper and were used to inflame the jury.

{¶79} In general, prosecutors are given considerable latitude in opening statements and closing arguments. *State v. Ballew,* 76 Ohio St.3d 244, 255, 667 N.E.2d 369 (1996). Additionally, both parties are entitled to latitude in responding to the arguments made by opposing counsel, therefore a prosecutor is entitled to rebut statements made by defense counsel in closing arguments. *State v. Isreal,* 12th Dist. No. CA2010–07–170, 2011–Ohio–1474, ¶ 62. In closing argument, a prosecutor may comment on "'what the evidence has shown and what reasonable inferences may be drawn therefrom.'" *State v. Lott,* 51 Ohio St.3d 160, 165, 555 N.E.2d 293

(1990), quoting *State v. Stephens,* 24 Ohio St.2d 76, 82, 263 N.E.2d 773 (1970). However, a prosecutor may not express his personal belief or opinion as to the credibility of a witness, the guilt of an accused, or allude to matters that are not supported by admissible evidence. *State v. Smith,* 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). In determining the impact of the alleged improper remarks, the closing argument must be reviewed in its entirety. *State v. Treesh,* 90 Ohio St.3d 460, 466, 739 N.E.2d 749 (2001); *State v. Hill,* 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996).

{¶80} Almost all of the statements that he directs this court to are taken out of context. For instance, he first claims that the prosecutor told the jury that Persohn did not take responsibility for his actions and now it was their duty to force him to take responsibility. Those were not the prosecutor's words. The prosecutor was merely stating that the trial process is about taking responsibility for one's actions. Tr. 371-371.

{¶81} Next, he claims that the prosecutor commented on Persohn's alleged previous drug sales. For instances, he asserts that the prosecutor stated that Dalrymple bought drugs from Persohn and it was because of those dealings that Dalrymple overdosed. He also directs this court to the prosecutor's comments regarding McClelland's testimony that he had previously purchased drugs from Persohn.

{¶82} Admittedly, the prosecutor does discuss these previous purchases, but he did so in the context of what the evidence showed. The alleged previous drug sales were confirmation that the two informants information matched and that this combined information is what lead to the controlled buy between McClelland and Persohn. Tr. 373-375. The prosecutor did not insinuate that Persohn sold Dalrymple the drugs that killed him. Rather the prosecutor was explaining why Dalrymple could not provide information that confirmed McClelland and DeSarro's information. Tr. 373.

{¶83} Persohn also claims that the prosecutor suggested to the jury that Persohn might hurt McClelland because he was a confidential informant and that the

officers' testimony could be believed because they have a great deal of experience in these cases.

**{¶84}** These arguments are both inaccurate of what was said during the closing argument. The prosecutor discussed what the evidence was that lead up to this controlled buy and why McClelland was nervous to testify. McClelland testified he was nervous to testify and he was nervous wearing the wire. Detective Downard testified that he previously wore wires and that when you do that you are more nervous because you do not know what will happen if the seller catches you with the wire on. Furthermore, the statements made as to what the evidence showed were made in reference to the defense's theory that there should have been either photographs or video of the drug transaction or an undercover agent could have been used. The prosecutor was merely commenting that only having audio of a controlled buy with a confidential informant is not atypical and the officers confirmed that in their testimony.

**{¶85}** The next three instances deal with comments that the prosecutor made about defense counsel and the defense. The first is that the prosecutor said he was "flip" about the defense.

**{¶86}** This is not a completely accurate account of the prosecutor's comments. The prosecutor's comments, in context, are as follows:

> Now, we talked about it in voir dire. You know, I would like to, you know, best-case scenario, I would like to have an Anglican Bishop be my witness that says, I went over and knocked on Ben Persohn's door at Riley Avenue, "knock, knock, knock," hello, Ben Persohn at Riley Avenue, 633 Riley Avenue. I'm here to buy heroin from you. I prefer to buy ten unit doses apparently for the sum of $150 in United States currency; do we have a deal?
>
> Well, I sound flip about it. But that's really what Mr. Hura's defense in this case is. That's what he thinks you should hear.

Tr. 375-376.

**{¶87}** This statement is not inflammatory. It is merely a comment that he was being flippant in his example of the ideal witness and what the perfect drug deal would be for prosecution.

**{¶88}** The next allegation is that the prosecutor stated, "Mr. Hura has perpetrated a fraud upon you." Tr. 412.

**{¶89}** The prosecutor did say that defense counsel "perpetuated a fraud" on the jury, but in the context that he said it, it was not improper. Tr. 412. Defense counsel was using a metaphor to show why he believed that Persohn should be found not guilty. The metaphor was his grandmother's cheesecake and one time she made it, she forgot an ingredient and it was bad. Defense counsel claimed there is a missing ingredient in this case, which is an identification of Persohn as the drug seller. In response to that argument, the prosecutor stated:

Mr. Hura has perpetuated a fraud upon you by use of a misplaced metaphor. One thing I know about his grandma's cheesecake — and I'll have to take this word for how good it is. But one thing I can tell you about the cheesecake that she supposedly made, even if that story was true, is this: It was cheesecake. It wasn't carrot cake; it wasn't a bundt cake. It wasn't some kind of German chocolate cheesecake. It was cheesecake.

But that's not why it's a misplaced metaphor. The reason it's a misplaced metaphor is because he wants you to think there's a missing ingredient. When in fact what he's saying to you is, you can't rely on the recipe. You need more ingredients. That's what he's telling you. And he's right. We were very careful to explain to you why the Drug Task Force does what it does; why the police officers investigate drugs cases the way they do. So that [sic] why? You can rely on them.

He made a – and I expected the defense was going to do just this: You can't rely upon Brian McClelland; you can't rely on him.

Tr. 412-414.

{¶90} The prosecutor also allegedly commented that defense counsel has stooped low during the trial and "shame on him." Similar to the above comments, this comment is not discussed in the context that it was given. The argument, in context, is as follows:

> Mr. Hura has stooped so low in the course of this trial as to suggest to you that the witnesses came forward and colluded their testimony, somehow over lunch.
>
> Suggest to you that it wasn't Brian McClelland who said this, that it was Lenny DeSarro. Shame on him for saying that. Shame on him for disparaging the testimony of these officers.

Tr. 417.

{¶91} Counsel is afforded wide latitude during closing arguments. *Pang v. Minch,* 53 Ohio St.3d 186, 194, 559 N.E.2d 1313 (1990). Moreover, counsel's closing argument must be read in its entirety, and the contested statement must be read in context. *See, e.g., State v. Hill,* 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996). In its context, the prosecutor was merely discussing why the defense does not work given the facts. Furthermore, when the closing is read in its entirety, the comment does not rise to the level of misconduct.

{¶92} Lastly, Persohn asserts that defense counsel told the jury what the verdict should be. He even contends that the prosecutor stated, "Deliberate like good citizens that you are and you should find the Defendant guilty."

{¶93} The prosecutor did not make the statement that is quoted above. What the prosecutor did say was:

> Think about the case. I invite you to do that. You should do that. You should listen to the Judge's instructions of law and deliberate like the good citizens that you are.
>
> But in doing so, don't make this job more complicated or more confusing or difficult than it is really is. You all brought with you in here all of the necessary tools to allow you to do your job.

And number one is common sense. You've got to use your common sense. The Judge will tell you that. Use your common sense. But don't make this job look [sic] difficult than it really is. All right?

Tr. 391-391.

**{¶94}** This was not improper. This comment does not discuss whether Persohn should be found guilty.

**{¶95}** That said, it is true that at the end of his closing argument, the prosecutor does instruct the jury to find Persohn guilty:

I told you a few minutes ago, Ladies and Gentlemen, that I was going to stand back up here and tell you what your verdict should be. And I'm going to say it right now: This Defendant should be found guilty. You should find this Defendant guilty of the offense for which he's charged, trafficking in ten unit doses of heroin in Columbiana County, on Riley Avenue on April 2nd, [sic] 2008.

Tr. 417-418.

**{¶96}** As mentioned above, the prosecutor is not permitted to express his or her personal opinion as to the guilt of the accused. *Smith,* 14 Ohio St.3d 13, 14, 470 N.E.2d 883. Stating that the defendant should be found guilty is an expression of the prosecutor's opinion. A better way to word this statement is to ask the jury to find the accused guilty.

**{¶97}** That said, while the statement is improper, when we consider the closing argument in its entirety, we cannot find that the result of the trial would have been different. Or in other words, the impact of this one improper statement in the closing argument does not result in an unfair trial.

**{¶98}** In all, the majority of the statements and testimony that Persohn directs this court to are not inflammatory or improper. That said, as is discussed above three of the complained of comments were improper and should not have been made. These comments, however, result in harmless error; the comments did not result in an unfair trial. This assignment of error is without merit.

Fifth Assignment of Error

**{¶99}** "Defendant/appellant's conviction is against the manifest weight of the evidence."

**{¶100}** In determining whether a verdict is against the manifest weight of the evidence, a court of appeals must review the entire record, weigh the evidence and all reasonable inferences, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" *Id.* A conviction will only be reversed as against the manifest weight of the evidence in exceptional circumstances. *Id.* at 387. This is so because the trier of fact is in a better position to determine credibility issues, since he personally viewed the demeanor, voice inflections and gestures of the witnesses. *Hill*, 75 Ohio St.3d 195, 204, 661 N.E.2d 1068; *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

**{¶101}** At trial, Detective Weekley from the Columbiana County Drug Task Force testified that he received information from an informant, Leonard DeSarro, that a white male named Ben was transporting heroin into Wellsville and selling to a known drug addict name Rick Dalrymple. Tr. 200-202. DeSarro could not perform a controlled buy because he had never dealt with this seller. Tr. 200-201. Dalrymple would not cooperate with the officer to perform a controlled buy. Tr. 202. A couple months later McClelland contacted Detective Weekley and informed him that he could buy off of Ben Persohn who lived on Riley Avenue. Tr. 201. The information McClelland and DeSarro's provided to Detective Weekley matched. Tr. 201. Therefore, the Drug Task Force attempted to initiate a controlled buy using McClelland as the buyer.

**{¶102}** McClelland indicated that he contacted Detective Weekley because he violated his probation and he was hoping if he helped the officers he would get a favorable recommendation from them that would help lessen his penalty. Tr. 260-261. He explained that although he performed the controlled buy, he still spent a

year in jail for his probation violation. Tr. 261. During his testimony he explained that he has been clean from heroin for two years. Tr. 263. McClelland explained that when he contacted Detective Weekley he proposed that he could do a controlled buy off of Persohn. Tr. 265. He explained that he called Persohn to set up the buy, that he was searched prior to the buy, a wire was placed on his person and Detective Skidmore, of the Columbiana County Drug Task Force, dropped him off down the street from the Persohn's house. Tr. 266-274. The buy occurred at Persohn's house on 633 Riley Avenue in East Liverpool. Tr. 268. After the buy, he walked back to the car Detective Skidmore was driving and was transported to a safe location where he was searched and gave a statement. Tr. 274-275. The wire that he wore during the buy allowed the officers who were doing surveillance of Persohn's house to hear what was occurring in the house. That audio was also recorded. The recording of the buy was admitted into evidence and was played for McClelland during his testimony. During the playing of the audio, he explained what was occurring. Tr. 276-284. He identified Persohn's voice on the recording, but admitted that he did not say Persohn's name or indicate the address of the residence where the buy was occurring. Tr. 279, 291, 299. However, McClelland testified that he purchased the heroin from Persohn and identified Persohn during the trial. Tr. 266, 284. The statement that he made to the officers after the buy occurred also indicated that he purchased heroin from "Ben" at 633 Riley Avenue.

{¶103} During the trial, the defense drew a lot of attention to the fact that Persohn was not identified on the audio recording, the house was not identified, and that none of the officers that were doing surveillance of the house saw Persohn sell McClelland the drugs or even saw McClelland enter the house located at 633 Riley Avenue. The prosecution attempted to explain why these things were not done through the testimony of the officers.

{¶104} Detective Downard, director of the Drug Task Force, gave a general overview of how a controlled buy is performed and explained what he heard on the audio during the drug transaction. He testified that from everything he heard and was told by McClelland he thought a drug buy occurred between McClelland and Persohn. Tr. 172. He also testified that drug dealers are often quiet during the deals

and do not want to say too much because they do not want to be identified. Tr. 145, 171. He explained that because of the fear of identification a lot of street names, slang and/or very little conversation occurs during the drug deal. Tr. 146.

{¶105} Detective Weekley stated that he was part of the surveillance team that was set up around Persohn's house. Tr. 209. He explained that they did surveillance to make sure they could hear what was going on and to protect the informant. Tr. 209. However, in doing the surveillance he was not actually able to see the house. Tr. 210, 223.

{¶106} Detective Hedrick of the Columbiana County Drug Task Force was also doing surveillance. Tr. 306. He explained that where the house sits, on a hillside and a curve in the road, it is hard to survey. Tr. 307. He explained that he was only able to make a couple passes by because if he made any more it would look suspicious. Tr. 307. He explained that because of the location they were not able to see McClelland enter the house or take photos of him entering the house. Tr. 319. The defense did not call any witnesses.

{¶107} The majority of McClelland's testimony is backed up by the officers that were involved in the surveillance of the drug transaction. That said, McClelland was the only individual who could identify Persohn as the seller. Thus, this is a credibility question that is best resolved by the trier of fact. Given the testimony we cannot find that the jury clearly lost its way when it believed McClelland's statement that Persohn sold him heroin at 633 Riley Avenue in East Liverpool, Ohio. Thus, the verdict is not against the manifest weight of the evidence. This assignment of error lacks merit.

Sixth Assignment of Error

{¶108} "Defendant/appellant was denied a fair trial and therefore due process because of prosecutorial misconduct."

{¶109} In reviewing allegations of prosecutorial misconduct, the test is whether the conduct is improper and whether the conduct prejudicially affected the substantial rights of the accused. *State v. Guade,* 10th Dist. No. 11 AP–718, 2012–Ohio–1423, ¶ 20, citing *State v. White,* 82 Ohio St.3d 16, 22, 1998–Ohio–363, 693 N.E.2d 772. "'[T]he touchstone of due process analysis in cases of alleged

prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.'" (Citation omitted.) *State v. Wilkerson,* 10th Dist. No. 01 A. P1127, 2002–Ohio–5416, ¶ 38. Therefore, prosecutorial misconduct will not be grounds for reversal unless the accused has been denied a fair trial. *State v. Maurer,* 15 Ohio St.3d 239, 266, 473 N.E.2d 768 (1984).

{¶110} At the outset it is noted that counsel did not object to any instances of the alleged prosecutorial misconduct. Thus, Persohn has forfeited all but plain error. *State v. Williams,* 79 Ohio St.3d 1, 12 (1997). Reversal for prosecutorial misconduct is warranted under the plain error standard if it is clear that the accused would not have been convicted without the improper conduct. *State v. Saleh,* 10th Dist. No. 07AP–431, 2009–Ohio–1542, ¶ 68.

{¶111} Persohn begins by directing this court to the following three comments in the prosecutor's opening statement. First, is the comment about heroin being used in Columbiana County. The second is the alleged comment that controlled buys are done in every police department in the country. And the third is the prosecutor's comment that he has tried this type of case many times.

{¶112} All three of these alleged comments were discussed in the fourth assignment of error. As explained under that assignment of error, we must read the opening statement in its entirety to determine the impact of the alleged improper remarks. *Treesh,* 90 Ohio St.3d 460, 466, 739 N.E.2d 749. When the statements are read in their entirety the comments do not amount to misconduct. In fact, as explained under that assignment of error, the statements are either taken out of context or Persohn misstates what the prosecutor actually said.

{¶113} Next, Persohn argues that prosecutorial misconduct was committed during the direct examination of Detective Downard, Detective Weekley, McClelland and Detective Hedrick. All of the alleged improper statements and/or questions asserted here were previously addressed under either the third or fourth assignments of error and we determined that they were not improper.

{¶114} Lastly, Persohn directs this court to statements that were made during the prosecutor's closing argument. All of the alleged improper statements were previously raised in the fourth assignment of error. The only statement that was

improper was the prosecutor's statement telling the jury what the verdict should be. However, as explained under that assignment of error, that one statement did not deny Persohn a fair trial or alter the result of the trial.

{¶115} In conclusion, there is only one improper statement made by the prosecutor during the trial. That statement, however, did not result in an unfair trial. Thus, this assignment of error is meritless.

### Seventh Assignment of Error

{¶116} "Defendant/appellant's conviction must be reversed due to ineffective assistance of counsel."

{¶117} We review a claim of ineffective assistance of counsel under the two-part test articulated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under this test, a reviewing court will not find counsel's performance ineffective unless the defendant can show his attorney's performance fell below an objective standard of reasonable representation and that prejudice arose from the lawyer's deficient performance. *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.

{¶118} In evaluating the claim of deficient performance, the reviewing court must be highly deferential to counsel's tactics. *Strickland,* 466 U.S. at 689. The court should not focus on what, in hindsight, may have been a more appropriate course of defense. *See State v. Phillips,* 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland,* 466 U.S. at 689; *State v. Hamblin,* 37 Ohio St.3d 153, 524 N.E.2d 476 (1988).

{¶119} Even if there is deficient performance, the defendant must also establish prejudice. To show prejudice, a defendant must prove that, but for his lawyer's errors, a reasonable probability exists that the result of the proceedings would have been different. *Bradley* at paragraph three of the syllabus. To establish that reasonable probability, the facts must be sufficient to undermine a court's confidence in the outcome. *Strickland* at 694.

{¶120} The first allegation is that counsel's performance was deficient because counsel did not object to Detective Downard's hearsay identification of

Persohn. He contends that since the confidential informant made no identification of Persohn, it is unlikely he would have been convicted without Detective Downard's hearsay identification.

**{¶121}** As explained under the second assignment of error, at trial McClelland, the confidential informant, did identify and indicate that Persohn sold him heroin at the residence located at 633 Riley Avenue on the date in question. Furthermore, his statement was admitted into evidence. The statement was taken on the date of the drug transaction, but after it occurred. That statement indicates that he purchased drugs from a person named Ben at 633 Riley Avenue. When that statement is taken in conjunction with the rest of the evidence, it cannot be deemed that the outcome of the trial would have been different if the hearsay identification had been objected to and sustained.

**{¶122}** The next argument concerning deficient performance is that counsel did not object to other acts evidence. As established under the third assignment of error, none of the complained of testimony is inadmissible other acts evidence. Thus, there was no error. Therefore, defense counsel's failure to object does not amount to deficient performance.

**{¶123}** The last argument concerning ineffective assistance of counsel was the failure to object to prosecutorial misconduct. As indicated in the fourth and sixth assignments of error, there is one instance during the closing argument that constitutes prosecutorial misconduct. However, as explained in those assignments of error that instance does not taint the entire trial and render it unfair. Or in other words, the outcome of the trial would not have been different. Thus, there was no prejudicial effect and counsel's performance was not ineffective.

**{¶124}** In conclusion, while counsel should have objected in a few instances, we cannot conclude that Persohn was prejudiced by counsel's failure to object. Thus, counsel's performance was not ineffective. This assignment of error lacks merit.

<u>Eighth Assignment of Error</u>

**{¶125}** "Defendant/appellant was denied his right to a fair trial pursuant to the doctrine of cumulative error."

**{¶126}** In this assignment of error, Persohn contends that the cumulative effect of the errors raised in his first seven assignments of error deprived him of a fair trial.

**{¶127}** An appellate court may reverse a defendant's conviction based on the doctrine of cumulative error. Cumulative error occurs when errors deemed separately harmless deny the defendant a fair trial. *State v. DeMarco,* 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

**{¶128}** As discussed above, there are three errors. They are: 1) the hearsay identification; 2) irrelevant testimony about what Persohn's sister did for a living; and, 3) one statement by the prosecutor in closing argument that probably should not have been made (telling the jury what its verdict should be). For many of the reasons espoused in the above assignments of error, even when considering these three errors together it did not result in an unfair trial. Consequently, this assignment of error lacks merit.

Conclusion

**{¶129}** For the foregoing reasons, there is not merit with any of the eight assignments of error. Therefore, the judgment of the trial court is affirmed.

Donofrio, J., concurs.
DeGenaro, J., concurs.